**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Daniel Dodson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 23-cv-00613 |
| | ) | |
| v. | ) | |
| | ) | |
| Chicago Transit Authority, | ) | |
| | ) | |
| Defendant. | ) | |

## Complaint

For his complaint against Defendant Chicago Transit Authority (the "CTA"), Daniel Dodson ("Dodson") states as follows:

### Parties

1.    Plaintiff Dodson was formerly a bus operator for the CTA.

2.    Defendant CTA is an independent governmental agency which operates the nation's second largest public transportation system—in Chicago and 35 surrounding suburbs.

### Jurisdiction and Venue

3.    This action arises under the laws of the United States, specifically, the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* and the First and Fourteenth Amendments to the United States Constitution.

4.    This action also arises under the laws of the State of Illinois, specifically the Illinois Religious Freedom Restoration Act, 775 ILCS 35, *et seq.*, the Illinois Health Care Right of Conscience Act, 745 ILCS 70, *et seq*; and the Illinois Human Rights Act, 775 ILCS 5/2-102.

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)(2) because the CTA is headquartered in the Northern District of Illinois and a substantial part of the events or omissions giving rise to Dodson's claims occurred in this District.

**Facts**

7.     On or around March 12, 2007, Dodson began working as a part-time bus operator for the CTA.

8.     Dodson became a full-time bus operator for the CTA on or around October 14, 2012.

9.     At all relevant times during his employment with the CTA, Dodson was a dedicated employee who met or exceeded the CTA's legitimate employment expectations.

10.     Beginning in late 2019 and early 2020, a global outbreak of a virus now referred to as COVID-19 emerged.

11.     COVID-19 was officially declared a pandemic by the World Health Organization in March 2020.

12.     At that time, great efforts were made by the public and private sector alike to develop a vaccine.

13.     To combat the spread of the virus, public health experts opined that the public should practice social distancing, wear masks, and isolate if showing symptoms of COVID-19. Employers across the country began requiring employees to practice these measures, and many also began permitting remote work.

14.     The U.S. Food and Drug Administration eventually granted Emergency Use Authorization for a COVID-19 vaccine, the Pfizer-BioNTech vaccine, on December 11, 2020. The Moderna vaccine was granted Emergency Use Authorization on December 18, 2020. The Johnson & Johnson vaccine was granted Emergency Use Authorization on February 27, 2021.

2

15.     With vaccines available to the general public, employers began to mandate that employees get vaccinated, or else suffer adverse employment action, such as being placed on unpaid leave or being terminated.

16.     The CTA did not initially require that employees obtain a COVID-19 vaccine. Throughout most of the pandemic, the CTA allowed its employees to continue working by encouraging safety measures, such as masking and social distancing.

17.     Dodson, like many other CTA employees, continued to work throughout the pandemic, was viewed as essential worker, and was eventually proclaimed as one of the "unsung heroes of the pandemic" by CTA President Dorval R. Carter Jr. ("Carter Jr.").

18.     The lack of a vaccine mandate throughout most of the pandemic did not cause the CTA any undue hardship.

19.     On September 3, 2021, approximately 10 months after the first vaccine was authorized, the CTA announced that all CTA employees were required to be fully vaccinated against COVID-19.

20.     At that time, Carter Jr. proclaimed that employees had to be vaccinated in order to "help fight off these variants and protect our loved ones and others who cannot be vaccinated."

21.     Carter Jr. made that proclamation even though the COVID-19 vaccines were not tested, designed, or made to prevent transmission of COVID-19.

22.     The mandatory COVID-19 Vaccination Policy also did not take into account individuals who have already recovered from COVID-19 and thus had antibodies or natural immunity, nor did it take into account alternative measures such as face coverings, personal protective equipment, self-monitoring and reporting of symptoms, or periodic testing.

3

23.     The CTA's mandatory COVID-19 Vaccination Policy was at odds with the Federal government's policy allowing certain large employers to mandate vaccination *or* periodic testing for their employees.

24.     The CTA's mandatory COVID-19 Vaccination Policy also differed substantially from the European Union's digital COVID-19 certificate, which considered the following as equivalent: (1) a COVID-19 vaccine; (2) a negative COVID-19 test; or (3) having previously recovered from COVID-19.

25.     The CTA has claimed, and still claims, to offer religious exemptions/ accommodations, stating on their "Careers" website the following:

> The CTA complies with all federal and state laws forbidding discrimination and will attempt to provide a reasonable accommodation to otherwise qualified individuals to enable them to perform the essential functions of the job. CTA will make reasonable accommodations for the known disabilities of otherwise qualified applicants for employment as well as its employees, unless undue hardship would result. . . . CTA will work with you to determine if an accommodation can be provided…

> If you are an applicant requesting a COVID-19 vaccine religious accommodation or other, please email the Equal Employment Opportunity Unit at EEODiversity@transitchicago.com."

26.     In order to obtain a religious exemption/accommodation from the mandatory COVID-19 Vaccination Policy, employees have to complete a "Request For Religious Exemption/Accommodation Related to COVID-19 Vaccine."

27.     On October 15, 2021, Dodson submitted to the CTA his request for a religious exemption/accommodation.

28.     In his request for a religious exemption/accommodation, Dodson wrote, "each of the manufacturers of the COVID vaccines currently available developed and confirmed their vaccines using fetal cell lines, which originated from aborted fetuses… partaking in a vaccine made from aborted fetuses makes me complicit in an action that offends my religious faith… as such, I cannot, in good conscience and in accord with my religious faith, take any such COVID vaccine at

this time… in addition, any coerced medical treatment goes against my religious faith and the right of conscience to control one's own medical treatment, free of coercion or force."

29.     On December 30, 2021, Dodson took a leave of absence from work because he had tested positive for the COVID-19 virus. He fully recovered and returned to work on January 10, 2022.

30.     On January 11, 2022, the CTA sent to Dodson a questionnaire for him to answer in relation to his request for a religious exemption/accommodation.

31.     On January 17, 2022, Dodson responded to the questionnaire and informed the CTA that he would be willing to submit to regular COVID-19 testing in lieu of becoming vaccinated against COVID-19.

32.     On February 17, 2022, the CTA denied Dodson's request for an exemption/accommodation, claiming that his request did "not substantiate a sincerely held religious belief or moral conviction that conflicts with the CTA's requirement that all employees be fully vaccinated against COVID-19," and informing him that he was required to become fully vaccinated against COVID-19.

33.     On February 25, 2022, Dodson informed the CTA that he wished to appeal the denial of his request for a religious exemption/accommodation and present additional supporting evidence for his request; the CTA told Dodson that he had until March 24, 2022 to become fully vaccinated against COVID-19.

34.     On February 26, 2022, Dodson requested that the CTA reconsider its denial of his request for a religious exemption/accommodation, and attached a letter from a pastor at his church, Armitage Baptist Church.

35.     In that letter, Dodson's pastor quoted the Bible, as well as other religious and theological works, and wrote:

Dodson [has been] a member in good standing of the Armitage Baptist Church since 10/05/05… He is both an active and devout member of our Church and serves the Lord… with sincere love and commitment… Dan Dodson is a genuine and a true Christian and, as such, he is expected to live by Biblical standards… based on Dan Dodson's communications with me, and the completion of the process required to assess matters of conscience, this letter confirms Dan Dodson's religious objection to receiving a COVID-19 vaccination… I have been able to see that the thought of getting the COVID-19 vaccine brings upon him a sense of guilt… This guilt proceeds from the firm conviction that, by getting the vaccine, he would be injecting an artificial substance foreign to his natural physical composition; therefore, going against the sanctity of his body (regarded as a temple) and sinning against God… I was able to verify that he presents a genuine and legitimate objection to using a vaccine that will disturb both the sanctity and original functions of his body as created and ordained by God… Moreover, I observed that he presents a legitimate objection to using aborted fetal cells in connection with COVID-19 vaccine(s), in violation of Christian doctrinal beliefs about the sanctity of life… Dad Dodson wants to honor God by protecting the sanctity of his body as a temple of God (created in His own image)… I ask that you recognize such religious objection and grant Dan Dodson an exemption from any mandatory COVID-19 vaccination

36.     Dodson's sincerely held religious beliefs, rooted in scripture and religious teachings, precluded (and still preclude) him from accepting into his body the Johnson & Johnson, Pfizer, and Moderna vaccines, in part because all three vaccines were derived from, produced, manufactured by, tested on, developed with, have their origins in research on, or are otherwise connected to aborted fetal cell lines.

37.     On March 4, 2022, the CTA informed Dodson that it would not accept the letter from his pastor.

38.     On March 14, 2022, Dodson sent an email the CTA's human resources department, stating, "I have been trying to get permission to come to the main office to discuss my situation with someone regarding my religious exemption accommodation… I was denied and have been trying to contact someone from the [Equal Employment Opportunity Unit]… The only person to contact me is someone named Brandon that has told me they are only the messenger, yet refused to give me any other information, including the name of his supervisor… Can you help?"

39.     On March 25, 2022, the CTA interviewed Dodson, learned that he had not become fully vaccinated against COVID-19, and gave him a final written warning—that he would be terminated if he did not begin the COVID-19 vaccination process within seven days; Dodson told the CTA that he did not understand why his request for a religious exemption/accommodation had been denied, as well as that the CTA had refused to accept paperwork from his pastor that supported his request.

40.     Dodson continued to hold true to his beliefs and continued to refuse, and to this day has refused, to obtain a COVID-19 vaccine.

41.     Despite the CTA's insistence that every employee had to be vaccinated in order to work for the CTA, the CTA allowed Dodson to continue working until April 5, 2022.

42.     On April 5, 2022, the CTA interviewed Dodson again, learned that he had not begun the COVID-19 vaccination process, pulled him out of service, and recommended that he be discharged. Dodson told the CTA that he had not been given a sufficient reason for the denial of his request for a religious exemption/accommodation. He also informed the CTA that the vaccines do not prevent COVID-19 infections, as well as that he had natural immunity to COVID-19, given that he had already contracted the virus and had fully recovered.

43.     On April 5, 2022, Dodson again sent the CTA the letter from his pastor supporting his request for a religious exemption/accommodation.

44.     On April 19, 2022, the CTA terminated Dodson for failing to become fully vaccinated against COVID-19.

45.     Upon information and belief, the CTA has never required the public to get vaccinated in order to utilize its public transportation services.

46.     Upon information and belief, the CTA has never required its employees to obtain vaccine boosters.

47.     As a result of the CTA's actions, Dodson has sustained damages including, but not limited to, lost income, lost bonuses, lost insurance, lost company benefits, and emotional distress.

## COUNT I – VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*

48.     Dodson hereby realleges and adopts each and every allegation in paragraphs 1-47 as if fully set forth herein.

49.     Title VII of the Civil Rights Act of 1964 prohibits the CTA from discriminating against its employees on the basis of their sincerely held religious beliefs. *See* 42 U.S.C. §2000e-2(a)

50.     Dodson holds sincere religious beliefs that preclude him from receiving a COVID-19 vaccine.

51.     Dodson informed the CTA of those beliefs and requested a religious exemption from/accommodation related to the vaccine mandate.

52.     The CTA failed to provide Dodson with a religious exemption/accommodation, thereby discriminating against Dodson because of his religious beliefs.

53.     The CTA did not, and does not, have any undue hardship to justify the denial of Dodson's religious exemption/accommodation request.

54.     The CTA's failure to provide Dodson a religious exemption/accommodation has harmed and will continue to harm Dodson.

55.     Dodson has filed a charge with the EEOC complaining of these discriminatory actions, has received a "Right to Sue" letter, and is filing this complaint within 90 days thereof.

WHEREFORE, Dodson respectfully prays for relief against the CTA as set forth in the Prayer for Relief set out below.

## COUNT II – VIOLATION OF THE FIRST AMENDMENT
## FREE EXERCISE CLAUSE

56.     Dodson hereby realleges and adopts each and every allegation in paragraphs 1-47 as if fully set forth herein.

8

57.     The Free Exercise Clause of the First Amendment to the United States Constitution (made applicable to the states by the Fourteenth Amendment) provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof…" U.S. CONST. amend. I.

58.     The CTA's mandatory vaccine policy substantially burdened Dodson's free exercise of religion by unlawfully conditioning his employment on Dodson abandoning his religious beliefs.

59.     The CTA's mandatory vaccine policy was not neutral and generally applicable as the CTA granted at least 36 religious exemption/accommodation requests, but denied a similar request made by Dodson.

60.     The CTA engaged in a process of individualized assessments when it reviewed requests for religious exemptions/accommodations.

61.     The CTA's termination of Dodson cannot be justified by a compelling governmental interest and is not narrowly tailored to advance any such interest.

WHEREFORE, Dodson respectfully prays for relief against the CTA as set forth in the Prayer for Relief set out below.

## COUNT III – VIOLATION OF FOURTEENTH AMENDMENT EQUAL PROTECTION

62.     Dodson hereby realleges and adopts each and every allegation in paragraphs 1-47 as if fully set forth herein.

63.     The Equal Protection Clause of the Fourteenth Amendment requires that the government treat similarly situated persons alike.

64.     The CTA has violated Dodson's right to equal protection by granting religious exemption/accommodation requests to some similarly situated employees but denying the same to him.

65.     The CTA has violated Dodson's right to equal protection by continuing to employ certain bus operators that are not vaccinated, but refusing to continue to employ Dodson on an equal basis.

66.     Under the Equal Protection Clause, government actions and laws which burden a fundamental right and treat persons unequally based on an inherently suspect classification are subject to strict scrutiny.

67.     The CTA cannot satisfy strict scrutiny.

WHEREFORE, Dodson respectfully prays for relief against the CTA as set forth in the Prayer for Relief set out below.

### COUNT IV – VIOLATION OF THE ILLINOIS HEALTH CARE RIGHT OF CONSCIENCE ACT, 745 ILCS 70

68.     Dodson hereby realleges and adopts each and every allegation in paragraphs 1-47 as if fully set forth herein.

69.     The Illinois Health Care Right of Conscience Act (the "Act") protects Dodson's rights to engage in the exercise of his sincerely held religious beliefs without fear of discrimination from any entity, whether public or private, including the CTA.

70.     In fact, the State of Illinois has declared it to be the public policy of the State to protect the religious conscience rights of all individuals in the State of Illinois as it relates to health care services. The Illinois Health Care Right of Conscience Act provides, specifically,

> The General Assembly finds and declares that people and organizations hold different beliefs about whether certain health care services are morally acceptable. **It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care whether acting individually, corporately, or in association with other persons; and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in providing, paying for, or refusing to obtain, receive, accept, deliver, pay for, or arrange for the payment of health**

**care services and medical care**. It is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care.

745 ILCS 70/2 (emphasis added).

71.     In furtherance of the State of Illinois public policy of protecting the religious conscience rights of all Illinoisans to exercise their sincere religious convictions in their medical decision-making, the Illinois Health Care Right of Conscience Act states:

**It shall be unlawful for any** person, public or **private institution**, or public official **to discriminate against any person in any manner**, including but not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or **any other privileges**, **because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience**.

745 ILCS 70/5 (emphasis added).

72.     The Illinois Health Care Right of Conscience Act further provides:

**It shall be unlawful for any public or private** employer, entity, agency, **institution**, official or person, including but not limited to, a medical, nursing or other medical training institution, to deny admission because of, to place any reference in its application form concerning, to orally question about, to impose any burdens in terms or conditions of employment on, or to otherwise discriminate against, any applicant, in terms of employment, **admission to or participation in any programs for which the applicant is eligible, or to discriminate in relation thereto, in any other manner, on account of the applicant's refusal to receive, obtain, accept, perform, counsel, suggest, recommend, refer, assist or participate in any way in any forms of health care services contrary to his or her conscience.**

745 ILCS 70/7 (emphasis added).

73.     The Illinois Health Care Right of Conscience Act defines "Health care" broadly to include vaccinations. Specifically, it provides that "Health Care":

means **any phase** of patient care, including but not limited to, **testing**; diagnosis; **prognosis**; ancillary research; **instructions**; family planning, counselling, referrals, or any other advice in connection with the use or procurement of contraceptives and sterilization or abortion procedures; **medication**; surgery or **other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or**

11

**health care facility**, **intended** for the **physical**, emotional, and mental well-being of persons.

745 ILCS 70/3 (a) (emphasis added).

74. The Illinois Health Care Right of Conscience Act defines "Conscience," as "a sincerely held set of moral convictions arising from belief in or relation to God, or which, though not so derived, arises from a place in the life of its possessor parallel to that filled by God among adherents to religious faiths." 745 ILCS 70/3(e).

75. A violation of the Illinois Health Care Right of Conscience Act provides for the following remedies:

> **Any person, association, corporation, entity or health care facility injured by any public or private person, association, agency, entity or corporation by reason of any action prohibited by this Act may commence a suit therefor, and shall recover threefold the actual damages, including pain and suffering, sustained by such person, association, corporation, entity or health care facility, the costs of the suit and reasonable attorney's fees; but in no case shall recovery be less than $2,500 for each violation in addition to costs of the suit and reasonable attorney's fees. These damage remedies shall be cumulative, and not exclusive of other remedies afforded under any other state or federal law.**

745 ILCS 70/12 (emphasis added).

76. The Illinois Health Care Right of Conscience Act acts as a super statute in Illinois, preempting and superseding all other acts and portions of acts that conflict with the explicit policies contained in the statute.

77. Specifically, the Illinois Health Care Right of Conscience Act states: "This Act shall supersede all other Acts or parts of Acts to the extent that any Acts or parts of Acts are inconsistent with the terms or operation of this Act." 745 ILCS 70/14.

78. Even as a public institution, the CTA is subject to the provision of the Illinois Health Care Right of Conscience Act under 745 ILCS 70/5 and 745 ILCS 70/7, and is therefore prohibited

from discriminating against Dodson for his refusal to accept one of the vaccines on account of his sincerely held religious beliefs.

79.     Dodson's sincerely held religious beliefs, which were articulated to the CTA under the signed written requests required by the mandatory COVID-19 Vaccination Policy, constitutes Dodson's "conscience" under the Act because they are "a sincerely held set of moral convictions arising from belief in or relation to God." 745 ILCS 70/3(e).

80.     The COVID-19 vaccines constitute "Health care" under the Act because they are a "phase of patient care," "medication," and "other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or health care facility, intended for the physical, emotional, and mental well-being of persons." 745 ILCS 70/3(a).

81.     The Act does not provide any defense to discriminate against Dodson based on so-called "undue hardship." *Rojas v. Martell*, 2020 IL App (2d) 190215, ¶ 43.

82.     By imposing its mandatory COVID-19 Vaccination Policy upon Dodson and refusing to grant him a religious exemption from/accommodation related to the mandatory COVID-19 Vaccination Policy, the CTA has impermissibly, unlawfully, and unconscionably discriminated against Dodson because of his conscientious refusal to receive or accept one of the three currently available COVID-19 vaccines in contradiction to his rights of conscience and sincerely held religious beliefs.

83.     By taking adverse employment action against Dodson for failure to comply with the mandatory COVID-19 Vaccination Policy, the CTA has impermissibly discriminated against Dodson on account of his sincerely held religious objections to receiving or accepting one of the three COVID-19 vaccines in violation of 745 ILCS 70/5.

84. The mandatory COVID-19 Vaccination Policy, on its face and as applied, is a gross violation of Dodson's sincerely held beliefs, and his right of conscience under the Illinois Health Care Right of Conscience Act.

85. The mandatory COVID-19 Vaccination Policy, on its face and as applied, is an impermissible discrimination against Dodson on the basis of his sincerely held religious beliefs, and in violation of Dodson's rights of conscience under the Illinois Health Care Right of Conscience Act.

WHEREFORE, Dodson respectfully prays for relief against the CTA as set forth in his Prayer for Relief set out below.

## COUNT V – VIOLATION OF THE ILLINOIS RELIGIOUS FREEDOM RESTORATION ACT

86. Dodson hereby realleges and adopts each and every allegation in paragraphs 1-47 as if fully set forth herein.

87. The Illinois Religious Freedom Restoration Act provides:

"Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest."

(775 ILCS 35).

88. The CTA's mandatory vaccine policy substantially burdened Dodson's exercise of religion by conditioning his employment on Dodson abandoning his religious beliefs.

89. The CTA cannot meet its burden of demonstrating that its termination of Dodson was in furtherance of a compelling governmental interest and that it was the least restrictive means of furthering that interest.

WHEREFORE, Dodson respectfully prays for relief against the CTA as set forth in his Prayer for Relief set out below.

14

### COUNT VI: VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT

90.     Dodson hereby realleges and adopts each and every allegation in paragraphs 1-47 as if fully set forth herein.

91.     The Illinois Human Rights Act provides:

It is a civil rights violation: …[f]or any employer to impose upon a person as a condition of …retaining employment…any terms or conditions that would require such person to violate or forgo a sincerely held practice of his or her …religion…unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's….sincerely held religious belief, practice or observance without undue hardship on the conduct of the employer's business."

775 ILCS 5/2-102(E-5).

92.     The CTA's mandatory Vaccination Policy imposed upon Dodson a condition of employment that required him to violate or forgo his sincerely held religious beliefs.

93.     Dodson informed the CTA of those beliefs and requested an exemption/accommodation from the vaccine mandate.

94.     The CTA denied his exemption/accommodation request without engaging in a *bona fide* effort to determine whether an accommodation was possible.

95.     Granting him an exemption/accommodation would not have caused the CTA undue hardship.

96.     The CTA's actions have harmed and will continue to harm Dodson.

97.     Dodson filed a charge with the Illinois Department of Human Rights complaining of these discriminatory actions, received a "Right to Sue" letter, and is filing this complaint within 95 days thereof.

WHEREFORE, Dodson respectfully prays for relief against the CTA as set forth in the Prayer for Relief set out below.

## Jury Demand

Dodson demands a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

## Prayer for Relief

WHEREFORE, Dodson respectfully prays for relief as follows: that the CTA be found liable, that judgment be entered against it, and that Dodson be awarded all remedies to which he and is entitled under the law, including:

a. back pay, including lost benefits;
b. front pay, including benefits (or reinstatement);
c. compensatory damages, including for emotional distress;
d. actual damages in an amount to be proven at trial (but not less than $2,500 per violation, as provided by 745 ILCS 70/12);
e. treble his actual damages, including those for emotional distress and pain and suffering, as provided by 745 ILCS 70/12;
f. reasonable costs and expenses of this action, including reasonable attorneys' fees and expert fees;
g. nominal damages; and
h. such other and further relief as the Court deems equitable and just under the circumstances.

Respectfully Submitted by,


/s/ Julie Herrera
/s/ Steve Molitor

Law Office of Julie O. Herrera
159 N. Sangamon St., Ste. 200
Chicago, IL 60607
312-479-3014 (Phone)
708-843-5802 (Fax)
jherrera@julieherreralaw.com
smolitor@julieherreralaw.com


/s/ Sorin A. Leahu

Leahu Law Group, LLC
53 W. Jackson Blvd, Suite 1527
Chicago, IL 60604
Telephone: (847)-529-7221
sleahu@leahulaw.com